IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CRAIG SANFORD and MARY JO
SANFORD,

                    Plaintiffs,

          v.

BRACEWELL & GUILIANI, LLP,

                    Defendant.

CIVIL ACTION
NO. 13-1205

## OPINION

**Slomsky, J.**                                    **March 20, 2014**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     FINDINGS OF FACT ......................................................................................... 2

        A. Events Leading To the Hiring of Defendant ................................................ 2

        B. Defendant is Retained as Counsel ............................................................... 3

III.    STANDARD OF REVIEW FOR EVALUATING A MOTION TO COMPEL
        ARBITRATION ................................................................................................. 7

IV.     CRAIG SANFORD'S CLAIMS MUST BE PURSUED IN ARBITRATION WHILE
        MARY JO SANFORD IS ENTITLED TO A JURY TRIAL ON WHETHER SHE IS
        A CLIENT OF THE FIRM AND ON THE ARBITRABILITY OF HER CLAIMS ........... 9

        A. Craig Sanford is Bound by the Arbitration Agreement ................................. 9

            1. Applicable Standard of Review .......................................................... 9

            2. The Complaint and Supporting Documents Establish that Craig Sanford
               Entered Into a Binding Arbitration Agreement with Defendant ........................ 11

                a. The Federal Arbitration Act ........................................................... 11

    b.   The Federal Arbitration Act as Applied to Craig Sanford.............................. 12

    c.   Arbitration Clauses in Fee Agreements ........................................... 14

    d.   The Arbitration Agreement is Enforceable Against Craig Sanford ............... 19

B.  Mary Jo Sanford is Entitled to a Jury Trial to Determine Whether She is
    a Client of the Firm and Whether She is Required to Arbitrate Her Claims ............. 20

    1.   Applicable Standard of Review ......................................................... 22

    2.   Issues of Fact Exist as to Whether Mary Jo Sanford is a Client of
         the Firm and Whether She is Required to Arbitrate Her Claims ......................... 23

V.   CONCLUSION......................................................................................... 29

## I. INTRODUCTION

Under the guise of moving money to an offshore bank account, purported Navy Seal and CIA operative Jamie Smith absconded with $12.5 million belonging to Craig and Mary Jo Sanford ("Plaintiffs"). To investigate the fraud perpetrated by Smith on Plaintiffs and to recover their funds, Plaintiffs hired the law firm of Bracewell & Guiliani ("Defendant" or "the Firm"). The Firm, however, failed to locate Smith or any of Plaintiffs' money. Dissatisfied with the Firm's work, Plaintiffs terminated the relationship and hired a new attorney. This attorney was able to locate Smith but failed to recover any money.

On February 8, 2013, Plaintiffs brought suit against Defendant in the Court of Common Pleas of Bucks County, Pennsylvania for professional negligence and breach of contract. Plaintiffs allege that the Firm failed to properly investigate Smith and the whereabouts of their money, thereby delaying their ability to find Smith and, ultimately, to recover their funds. Plaintiffs are suing for damages for the unrecovered funds.

On March 6, 2013, Defendant removed the case to this Court. (Doc. No. 1.) On March 13, 2013, Defendant filed a Motion to Stay Pending Arbitration pursuant to §3 of the Federal Arbitration Act. 9 U.S.C. §3. (Doc. No. 3.) In the Motion, Defendant argues that the Firm established an attorney-client relationship with Craig Sanford when he signed the Firm's engagement letter. Defendant further argues that the engagement letter contains an enforceable arbitration clause covering all matters arising out of the Firm's representation. For this reason, Defendant contends that the Federal Arbitration Act requires that Craig Sanford's claim be stayed pending the outcome of arbitration. As to Mary Jo Sanford, Defendant claims that she was never a client of the firm, but that if she was, she too would be bound by the arbitration clause.

Hearings on the Motion to Stay Pending Arbitration were held on May 2, 2013, July 15, 2013, July 31, 2013, and September 18, 2013. After extensive briefing and oral argument,

Defendant's Motion is now ripe for disposition.[1]  For reasons that follow, the Court will stay Craig Sanford's claims pending the outcome of arbitration, but will allow Mary Jo Sanford's claims to go forward in this Court with a jury trial to determine whether she was a client of the firm, and if so, whether she is required to arbitrate her claims.

## II.  FINDINGS OF FACT

### A.  Events Leading To the Hiring of Defendant

Plaintiffs are husband and wife and reside in Bucks County, Pennsylvania.  (Doc. No. 1-1 at 15.)  Plaintiffs owned and operated a medical waste disposal business for a number of years until they sold the business for over $14 million in 2005.  Id.  After the sale, Plaintiffs sought to move $12.5 million to an offshore bank account.  Id.

In September 2007, Craig Sanford met Jamie Smith through a mutual acquaintance. (Doc. No. 1-1 at 16.)  Smith claimed to be the owner and CEO of the corporate entity SCG International, LLC ("SCG").  Id.  Smith also professed to be a former Navy Seal, Harvard graduate, and CIA operative.  Id.  For a small service charge, Smith offered to place Plaintiffs' money in an offshore interest-bearing account and to return it to them in eighteen months.  Id.

---

[1]  In deciding this Motion, the Court has considered the Complaint (Doc. No. 1-1), Defendant's Motion to Stay Pending Arbitration (Doc. No. 3), Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Stay Pending Arbitration (Doc. No. 7), Defendant's Reply to Plaintiffs' Opposition to the Motion to Stay Pending Arbitration (Doc. No. 11), Defendant's Supplemental Memorandum in Support of the Motion to Stay Pending Arbitration (Doc. No. 15), Plaintiffs' Memorandum of Law at the Request of the Court's Order of June 17, 2013 (Doc. No. 21), Defendant's Memorandum of Law Regarding the Standards for Arbitrability Determinations (Doc. No. 22), Defendant's Supplemental Brief in Support of the Motion to Stay Pending Arbitration (Doc. No. 32), Plaintiffs' Supplemental Memorandum in Further Opposition to Motion to Compel Arbitration regarding the Attorney-Client Relationship Between the Defendant and Mary Jo Sanford (Doc. No. 33), Defendant's Reply Brief in Support of the Motion to Stay Pending Arbitration (Doc. No. 34), and the arguments of counsel and testimony at the hearings held on May 2, 2013, July 15, 2013, July 31, 2013, and September 18, 2013.

In November 2007, Plaintiffs transferred the $12.5 million to Smith and/or SCG.  Id. Plaintiffs were to earn interest on the money until it was repaid on May 27, 2009.  Id.  Smith provided Plaintiffs with a promissory note to document the transaction.  (Id. at 17, 27.)  During the term of the note, Craig Sanford repeatedly attempted to contact Smith to confirm that the money was secure.  (Id. at 17.)  Sanford was unable to reach Smith for over eighteen months.  Id. In the spring of 2009, Smith's attorney contacted Sanford to advise him that Smith wished to renegotiate a payback agreement with Plaintiffs.  Id.  At that point, Sanford demanded return of the full $12.5 million.  When the note came due in May 2009, Plaintiffs received neither payback of their money nor a new payback agreement.  Id.  The Sanfords then sought legal counsel to help them recover their money.

**B.  Defendant is Retained as Counsel**

The events surrounding the retention of the Firm begin in the summer of 2009.  At that time, while vacationing in the Pocono Mountains, Craig Sanford spoke with his neighbor, David Stockwell, about his problems with Smith and the failed attempts to recover his money.  (Id. at 18.)  Stockwell is a partner in the Firm's New York and Dubai offices.  Id.  According to the Complaint, Stockwell "assured [Plaintiffs] that his firm would be able to assist them in getting a return of their money from Smith and/or SCG."  Id.  After their initial conversation, Mr. Sanford participated in a conference call with Stockwell and his partner, Jonathan Halpern.  (Doc. No.16 at 36:15-19.)  Halpern is a partner in Defendant's New York office and specializes in white collar criminal defense work.  (Doc. No. 24 at 42:20-23; 45: 9.)  During the call, Mr. Sanford was informed that the Firm would require a retainer fee of $50,000 for their representation.

At some point after this call, Plaintiffs gave Stockwell a check for $50,000 drawn from their joint bank account.  Mrs. Sanford testified that she personally wrote the check and handed it to Stockwell.  (Id. at 89:2-5; 93:13-15.)  Mrs. Sanford testified that after Stockwell received the

3

retainer, he told her that "[Bracewell & Giuliani] would take the case.  We will find your money.
. . .  We will start the proceedings to get your money . . . ."  (Id. at 94:8-11.)  She described this
conversation as an "oral agreement" that the firm would represent both herself and her husband
in their efforts to locate and recover their money.  (Id. at 92:7-11; 94:23.)

On September 9, 2009, attorney Halpern sent Mr. Sanford an engagement letter
("Engagement Letter" or "Letter").  The Letter was addressed only to Mr. Sanford and stated that
he was the client of the firm.[2]  (Doc. No. 1-1 at 32.)  Attached to the Letter was a document titled
"Bracewell & Giuliani LLP Terms of Engagement," which contained the following section:

> **Client of the Firm**
>
> Since B&G has been engaged to represent the client only, the
> engagement does not include the client's affiliated or related
> entities, or their respective individual partners or employees.
>
>        *          *          *
>
> For example . . . for individuals, our representation does not
> include employers, partners, spouses, siblings, or other family
> members.  In the event we are asked to undertake representation of
> any other entity in connection with this engagement, we will do so
> only by agreement defined in the Engagement Letter.

(Id. at 36.)

The Engagement Letter also contained the following arbitration clause, which is set forth
in pertinent part:

> **Agreement Concerning Arbitration**
>
> Client and B&G agree that any controversy, dispute or claim,
> including any dispute as to B&G's fees for legal services, arising
> out of or relating to the engagement described in this Engagement
> Letter or any future engagement of B&G, shall be resolved by
> arbitration in New York County before the International Institute

---

[2] The first line of the Letter reads: "Thank you for engaging us to represent you, Craig Sanford
("you" or the "Client"), in connection with the above matter."  (Doc. No. 1-1 at 32.)

for Conflict Prevention and Resolution (the "IICPR"), an arbitral forum outside Part 137 of the Rules of the Chief Administrator of the Courts (22 NYCRR).  Such arbitration shall be governed by IICPR Rules for Non-Administered Arbitration (the "IICPR Rules").

\*               \*               \*

By signing this Engagement Letter, Client and B&G agree to waive their rights with regard to arbitration pursuant to Part 137, which includes the right to reject the arbitrator's award by commencing an action on the merits (trial de novo) in a court of law.

\*               \*               \*

Client and B&G acknowledge that by entering into this agreement, they waive their rights to a trial by jury and the procedural rights related thereto.

\*               \*               \*

Consultation with Independent Counsel

Under the terms of this Engagement Letter and the attached Terms of Engagement, Client has specific obligations to B&G (for example the obligation to provide complete and accurate information to the firm).  Moreover, there are limits to the rights that Client might otherwise have (for example the agreement to resolve any dispute with B&G by arbitration rather than by jury trial).  If you wish to obtain independent advice concerning these or any other provisions of this Engagement Letter or Terms of Engagement, we encourage you to contact counsel of your choice.

Please call me if you wish to discuss any aspect of this engagement.

If this letter and the Terms of Engagement accurately reflect our agreement, please sign the enclosed copy of this letter and return it to me.

(Id. at 34-35.)

5

Mr. Sanford signed the Engagement Letter sometime between September 9, 2009 and December 8, 2009.[3] Mrs. Sanford testified that she never read the Engagement Letter or knew of its existence.  (Doc. No. 24 at 89:12-19; 90:1-7.)

On or about March 22, 2010, Craig Sanford terminated the representation.  (Doc. No. 1-1 at 18.)  According to Plaintiffs, the legal work done by Defendant was "incomplete, inconclusive, and inadequate."  Id.  They claim that Defendant "failed to employ the necessary and appropriate legal skill to obtain a return of [Plaintiffs'] money."  (Id. at 18-19.)

Following the termination, Plaintiffs hired another attorney who successfully located Smith.  (Id. at 19.)  By the time Smith was discovered, however, he had disposed of the funds.  (Id. at 20.)  Plaintiffs argue that "as a result of the firm's failure to locate and secure [their] money, Smith was able to control it into 2012 and dissipate the funds entirely."  (Id.)  Plaintiffs have yet to recover any portion of the $12.5 million.  (Id.)

As noted previously, on February 8, 2013, Plaintiffs brought suit against Defendant in the Court of Common Pleas of Bucks County, Pennsylvania for professional negligence and breach of contract.  On March 6, 2013, Defendant removed the case to this Court.  (Doc. No. 1.)  On March 13, 2013, Defendant filed the pending Motion to Stay Pending Arbitration pursuant to §3 of the Federal Arbitration Act.  9 U.S.C. §3.  (Doc. No. 3.)

---

[3] The Engagement Letter attached to the Complaint was unsigned.  On April 29, 2013, the Court held a hearing at which Mr. Sanford testified that he never received the Letter.  (Doc. No. 16 at 52:13-22.)  Subsequently, Defendant produced a copy of a fax sent from Mr. Sanford to Defendant on December 8, 2009.  (Doc. No. 15.)  The fax contains the four-page Engagement Letter, dated September 9, 2009, and signed by both Halpern and Mr. Sanford.  Plaintiffs do not contest the authenticity of Sanford's signature.  Assuming the date on the letter is accurate, Sanford must have received and signed the Engagement Letter sometime between September 9, 2009 and December 8, 2009.

## III.  STANDARD OF REVIEW FOR EVALUATING A MOTION TO COMPEL ARBITRATION

Until recently, the proper standard for evaluating a motion to compel arbitration under the Federal Arbitration Act ("FAA") was unclear.  Some courts applied a motion to dismiss standard, while others applied a motion for summary judgment standard.  This dichotomy was clarified by the Third Circuit in Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764 (3d Cir. 2013).  In Guidotti, the Court explained that the inconsistent application of the two standards stemmed from "the competing purposes of the FAA, and by the values underlying contract interpretation."  Id. at 773.  The Court found that "the FAA places considerable emphasis on efficient and speedy dispute resolution," favoring the application of a Rule 12(b)(6) motion to dismiss standard and no discovery process.  Id. at 773.   However, the Supreme Court has "rejected the suggestion that the overriding goal of the Arbitration Act was to promote the expeditious resolution of claims."  Id.  Thus, as Guidotti noted, this indicates that discovery should be permitted and a motion for summary judgment standard may apply.  716 F.3d at 774.

The Guidotti Court also found that "[b]ecause arbitration is a matter of contract between the parties, a judicial mandate to arbitrate must be predicated upon the parties' consent." Guidotti, 716 F.3d at 771 (citing Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd., 636 F.2d 51, 54 (3d Cir. 1980) (internal citations omitted).  In an effort to ensure that an order to arbitrate is based on the parties' consent, and to enforce the provisions of the FAA, the Court noted that the standard of review for motions to compel arbitration should be tied to the strength of the complaint and its supporting documents.  The Court therefore held that:

> [W]hen it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.  But if the complaint and its supporting documents are unclear regarding the agreement to

arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on the question. After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard. In the event that summary judgment is not warranted because the party opposing arbitration can demonstrate, by means of citations to the record, that there is a genuine dispute as to the enforceability of the arbitration clause, the court may then proceed summarily to a trial regarding the making of the arbitration agreement or the failure, neglect, or refusal to perform the same, as Section 4 of the FAA envisions.

Guidotti, 716 F.3d at 776 (internal citations omitted).

Because of the uniqueness of the legal and factual issues presented in this case, which partially involve matters of first impression in the Third Circuit, and in light of Guidotti, this Court gave the parties latitude to present evidence from witnesses and documents on the creation of the attorney-client relationship and the enforceability of the arbitration clause as to each Plaintiff.[4] The Court held three hearings and has reviewed the evidence, beginning with the Complaint, in order to determine which standard is applicable. For reasons discussed more fully below, the Court will apply different standards of review to Mr. and Mrs. Sanford. The enforceability of the arbitration clause as to Mr. Sanford will be examined under a Rule 12(b)(6) motion to dismiss standard, and the Court will "consider only the complaint, exhibits attached to the complaint . . . as well as undisputedly authentic documents if the complainant's claims are based upon those documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010). The enforceability of this clause as to Mrs. Sanford will be examined under a Rule 56 motion for

---

[4] The witnesses who testified at the hearings on the Motion include Mr. Sanford (Doc. No. 16), Mrs. Sanford (Doc. No. 24), attorney Halpern (Id.), and Lily Yee, Halpern's legal assistant. (Id.) Their testimony raised questions regarding Mrs. Sanford's status as a client of the firm and whether her claims must be arbitrated. As a result, Plaintiffs were permitted to examine David Stockwell (Doc. No. 30) on these issues. (See Doc. No. 26 at 11:9-24.)

summary judgment standard, and the Court will "go beyond the pleadings" to examine all

discovery and testimony produced.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

## IV.  CRAIG SANFORD'S CLAIMS MUST BE PURSUED IN ARBITRATION WHILE MARY JO SANFORD IS ENTITLED TO A JURY TRIAL ON WHETHER SHE IS A CLIENT OF THE FIRM AND ON THE ARBITRABILITY OF HER CLAIMS

### A.  Craig Sanford is Bound by the Arbitration Agreement

#### 1.  Applicable Standard of Review

Examining the face of the Complaint and all documents attached thereto, it is clear that

Mr. Sanford's claims are "subject to an enforceable arbitration clause," and a Rule 12(b)(6)

motion to dismiss standard should be applied.  Guidotti, 716 F.3d at 776.  First, the Verified

Complaint states that Plaintiffs entered into a contract with Defendant through the signing of the

Engagement Letter.[5]  Second, the Engagement Letter is attached to the Verified Complaint and

contains an arbitration clause.  Third, Mr. Sanford's and Mr. Halpern's signatures both appear at

the bottom of the Engagement Letter.[6]  These facts establish that Mr. Sanford entered into a

written contract with Defendant for legal services and, as discussed below, the contract contains

an enforceable arbitration clause.

Furthermore, the Complaint alleges claims of professional negligence and breach of

contract.  These claims fall within the scope of the arbitration provision, which states, in

pertinent part:

---

[5] See Doc. No. 1-1 ("On or about September 9, 2009, the Sanfords entered into an attorney-client relationship with Bracewell & Giuliani, LLP by way of an engagement agreement between Jonathan N. Halpern, Esquire for the Firm and Mr. Sanford.").

[6] Attached to the Verified Complaint is an unsigned copy of the Engagement Letter, including the arbitration clause.  (Doc. No. 32-42.)  As discussed in footnote 3, supra, the Firm has produced a copy of the Letter signed by both Halpern and Mr. Sanford.  (Doc. No. 15-1.) Plaintiffs do not dispute that Craig Sanford signed the Engagement Letter.

> Agreement Concerning Arbitration
>
> Client and B&G agree that <u>any controversy, dispute or claim</u>, including any dispute as to B&G's fees for legal services, <u>arising out of or relating to the engagement described in this Engagement Letter</u> or any future engagement of B&G, shall be resolved by arbitration in New York County before the International Institute for Conflict Prevention and Resolution (the "IICPR"), an arbitral forum outside Part 137 of the Rules of the Chief Administrator of the Courts (22 NYCRR).  Such arbitration shall be governed by IICPR Rules for Non-Administered Arbitration (the "IICPR Rules").

(Doc. No. 1-1 at 34.) (emphasis added)

This arbitration clause covers "any" claim "arising out of" or "relating to" the engagement.  The term "any" is broad and encompasses Mr. Sanford's claims of professional negligence and breach of contract.  Further, the Third Circuit has held that "when phrases such as 'arising under' and 'arising out of' appear in arbitration provisions, they are normally given broad construction."  <u>Battaglia v. McKendry</u>, 233 F.3d 720, 727 (3d Cir. 2000).  Because it is apparent based on the Complaint and Engagement Letter that Mr. Sanford's claims are subject to an enforceable arbitration clause, the Motion to Compel Arbitration of his claims will be examined under a motion to dismiss standard.  <u>Guidotti</u>, 716 F.3d at 771.

In considering a motion to dismiss under Rule 12(b)(6), the court must determine whether a complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  <u>Ethypharm S.A. France v. Abbott Labs.</u>, 707 F.3d 223, n.14 (3d Cir. 2013) (citing <u>Sheridan v. NGK Metals Corp.</u>, 609 F.3d 239, n.27 (3d Cir. 2010)).  Under this standard, all factual allegations must be construed in the light most favorable to the plaintiff and the court may "consider <u>only</u> the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon those documents."  <u>Mayer v. Belichick</u>, 605 F.3d 223, 230 (3d Cir. 2010) (emphasis added).  In the

context of a motion to compel arbitration, the Complaint and documents relied upon in the Complaint must be looked at in the light most favorable to the non-moving party, here Mr. Sanford, to determine if the arbitration agreement is enforceable.

**2. The Complaint and Supporting Documents Establish that Craig Sanford Entered Into a Binding Arbitration Agreement with Defendant**

In order for Craig Sanford to prevail on his assertion that he is entitled to a jury trial on his claims against the Firm, rather than be compelled to pursue his claims through arbitration, the Complaint and its supporting documents must establish that the arbitration agreement is unenforceable under the FAA.

**a. The Federal Arbitration Act**

The FAA has established "a strong federal policy in favor of the resolution of disputes through arbitration." Alexander v. Anthony Int'l, L.P., 341 F.3d 256, 263 (3d Cir. 2003). The FAA created "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24 (1983) (emphasis added). The Supreme Court has held on "numerous occasions that the central or primary purpose of the FAA is to ensure that private agreements to arbitrate are enforced according to their terms." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 682 (2010) (quoting Volt Information Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 479 (1989); citing Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57, 58 (1995); Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 688 (1996)) (internal quotations omitted). Attorney-client arbitration agreements are not specifically excluded by statute from the provisions of the FAA.

Accordingly, a written, contractual arbitration agreement is presumptively valid.

11

9 U.S.C. §2.  Indeed, arbitration agreements are "valid, irrevocable, and enforceable, save upon

such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2;  Puleo

v. Chase Bank USA, N.A., 605 F.3d 172, 178 (3d Cir. 2010) (citing Spinetti v. Serv. Corp.

Intern., 324 F.3d 212, 218 (3d Cir.2003) (quoting Gilmer v. Interstate/Johnson Lane Corp., 500

U.S. 20, 24 (1991)).  In order to have his case tried before a jury, the Complaint and pertinent

supporting documents must contain enough factual matter to establish that the arbitration

agreement Craig Sanford signed is "unenforceable based on any of the generally applicable

contract defenses, such as fraud, duress, or unconscionability. . . ."  Quilloin v. Tenet

HealthSystem Philadelphia, Inc., 673 F.3d 221, 229 (3d Cir. 2012).

### b.  The Federal Arbitration Act as Applied to Craig Sanford

  To meet his burden, Sanford argues that the arbitration agreement is unconscionable and

therefore unenforceable.  To establish unconscionability, Sanford must prove that the arbitration

agreement is both procedurally and substantively unconscionable.[7]  Id. at 230.

---

[7]  Plaintiffs do not argue that the arbitration clause is substantively unconscionable.  An
agreement is substantively unconscionable when its terms unreasonably favor the drafting
party.  Estate of Hodges v. Meadows, No. 12-01698, 2013 WL 1294480 (E.D. Pa. Mar. 29,
2013).  For example, the Third Circuit found an arbitration agreement between an employee
and an employer to be substantively unconscionable where the terms of the arbitration
agreement favored the employer by: 1) requiring the employee to file a grievance within five
days of the complained-of incident in order to preserve the opportunity to arbitrate;
2) requiring the employee to bear his own attorney's fees, costs and expenses, even if he
prevailed in the arbitration; and 3) allowing the employer to strike two arbitrators from a
potential panel of arbitrators but only allowing the employee to strike one.  Nino v. Jewelry
Exch., Inc., 609 F.3d 191, 202 (3d Cir. 2010).

The arbitration clause at issue here does not unreasonably favor the Firm.  It binds both parties
equally, requiring "any controversy, dispute or claim . . . arising out of or relating to" the
representation to be arbitrated.  While the arbitration agreement does state that each party
shall bear their own costs and attorney's fees, it does not state that Sanford is required to file
his claim within a five day window.  In addition, the Engagement Letter states that the
arbitration will be governed by the International Institute for Conflict Prevention and
Resolution's Rules for Non-Administered Arbitration.  The Rules call for the selection of

In determining whether an agreement is procedurally unconscionable, a court must examine "the process by which [the] agreement is reached" and the "form" of the agreement, including the language within it.  Zimmer v. CooperNeff Advisors, Inc., 523 F.3d 244, 228 (3d Cir. 2008) (quoting Harris v. Green Tree Fin. Corp., 183 F. 3d 173, 181 (3d Cir. 1999) (quotation marks omitted).  An agreement is "procedurally unconscionable where there was a lack of meaningful choice in the acceptance of the challenged provision." Quilloin, 673 F.3d at 235 (quoting Salley v. Option One Mortg. Corp., 592 Pa. 323, 331 (2007)) (quotation marks omitted).  Factors a court must consider when examining procedural unconscionability include: "the take-it-or-leave-it nature of the standardized form of the document, the parties' relative bargaining positions, and the degree of economic compulsion motivating the adhering party." Id. at 235-36.

The arbitration clause at issue here was embedded within a standardized take-it-or-leave-it fee agreement.  However, there was no degree of economic compulsion motivating Mr. Sanford.  He is sophisticated in business and was free to choose any law firm he wanted to pursue his claims against Smith.[8]  As to the relative bargaining positions between the parties, Mr.

---

neutral arbitrators and aim to create "a private procedure that is fair, expeditious, economical, and less burdensome and adversarial than litigation."  (Doc. No. 3-1 at 3.)

[8]   Both Mr. and Mrs. Sanford argue that because they lack legal training, they do not qualify as sophisticated clients and could not be expected to understand the fee agreement and arbitration clause.  See Doc. No. 16 ("[Mr. Sanford] is an individual who is not sophisticated in this area being asked to agree to [a fee agreement] that he told [the Court] he didn't comprehend."); Doc. No. 24 at 91-92:15- 5 ("Plaintiffs' Counsel:  Do you have any legal training?  Mrs. Sanford:  . . . no, I have no legal experience or background or education.").

Plaintiffs' argument is not persuasive.  The measure of a sophisticated client is not based solely on whether the client has prior legal experience.  Such a standard would be too difficult to enforce.  Plaintiffs ran a successful multi-million dollar business for years.  They are familiar with the litigation process and with the retention of lawyers generally.  Their company was involved in litigation, and Mrs. Sanford recalled hiring at least one attorney to

Sanford contends that an arbitration clause embedded within an attorney-client engagement agreement inherently tips the balance of power in a law firm's favor.  Moreover, he argues that by placing arbitration clauses in fee agreements, attorneys breach important ethical obligations to clients, including the duty of candor and duty of loyalty.  Hybrid engagement-arbitration clauses in attorney fee agreements, he argues, are procedurally unconscionable because they serve to coerce unwitting clients into forfeiting their right to a jury trial.

### c.  Arbitration Clauses in Fee Agreements

Plaintiff's argument highlights a topic of great debate within the legal community.[9]  As one scholar put it, "there is at least an appearance that when attorneys propose [arbitration] agreements it is because they, not the clients, stand to benefit."  Steven Quiring, <u>Attorney-Client Arbitration:  A Search for Appropriate Guidelines for Pre-Dispute Agreements</u>, 80 TEX. L. REV. 1213, 1213 (2002).  There is concern in the legal community that certain clients may not understand all of the legal implications that accompany arbitration agreements.  <u>Id.</u>  Therefore,

---

represent them during the sale of their business.  (Doc. No. 24 at 96:9-13; 98:3-4.)  Further, the language of the four-page engagement letter, and the arbitration clause within it, is clear and concise.  It does not require legal training to comprehend its terms.  Plaintiffs have the ability and wherewithal to understand the fee agreement and arbitration clause.

[9]  <u>See</u> Steven Quiring, <u>Attorney-Client Arbitration:  A Search for Appropriate Guidelines for Pre-Dispute Agreements</u>, 80 TEX. L. REV. 1213, 1216 (2002) (". . .[T]he ABA is now firmly committed to the use of arbitration in [attorney-client]. . . fee disputes.); <u>cf</u> Chrissy L. Schwennsen, <u>Arbitration Clauses in Fee Retainer Agreements</u>, 3 ST. MARY'S J. LEGAL MAL. & ETHICS 330, 330-31 (2013) ("Although arbitration clauses in attorney-client retainer agreements are enforceable, courts across the country continuously struggle with the undecided question of whether the attorney is required to fully apprise the client of the legal consequences of such a clause.  State courts take various viewpoints on the issue, and most stand contrary to the position of the American Bar Association and state ethics committee opinions on the subject."); Matthew J. Clark, <u>The Legal and Ethical Implications of Pre-Dispute Agreements Between Attorneys and Clients to Arbitrate Fee Disputes</u>, 84 IOWA L. REV. 827, 846 (1999) ("In fact, commentators, caselaw, and state bar organizations debate the propriety of [arbitration clauses within retainer agreements], some arguing that they infringe upon the fiduciary and ethical obligations that an attorney owes to its clients, others arguing that no ethical dilemma arises.").

some scholars argue that the agreements violate public policy because of the inherit inequality of bargaining power between the parties.  Id.

In reaction to these concerns, some state courts and ethics committees have imposed specific notice requirements on attorneys who wish to use an engagement agreement with an arbitration clause.  These notice requirements are meant to equalize the bargaining power between the attorney and client.  For example, the District of Columbia Bar Legal Ethics Committee has mandated that arbitration clauses in fee agreements will only be enforced if the client is represented by outside counsel before signing.  Opinion No. 211 (1990).  The Michigan Standing Committee on Professional and Judicial Ethics has created a slightly less onerous rule requiring attorneys to communicate in writing that their clients may obtain counsel to advise them on the clause.  Opinion Number RI-196 (1994).  Moreover, in Bezio v. Draeger, 737 F.3d 819, 820 (1st Cir. 2013), the First Circuit noted:

> It is clear that Maine professional responsibility law for attorneys permits arbitration of legal malpractice claims so long as there is no prospective limitation of the firm's liability. It is also clear that Maine law, like the FAA, evidences no hostility to the use of the arbitral forum, and Maine would enforce this arbitration of malpractice claims clause.

In Hodges v. Reasonover, 12-0043 (La. 7/2/12); 103 So. 3d 1069, the Louisiana Supreme Court held that in order for an arbitration clause in a fee agreement to be enforceable, an attorney must disclose to the client the effect of the arbitration clause and the client's rights in regard to it. Thus, the Court required an attorney to provide notice of the following in the engagement agreement: 1) the client's "waiver of the right to a jury trial;" 2) the client's "waiver of the right to an appeal;" 3) the client's "waiver of the right to broad discovery under the Louisiana Code of Civil Procedure and/or Federal Rules of Civil Procedure;" 4) the fact that "arbitration may involve substantial upfront costs compared to litigation;" 5) "explicit disclosure of the nature of

claims covered by the arbitration clause, such as fee disputes or malpractice claims;" 6) the fact that "the arbitration clause does not impinge upon the client's right to make a disciplinary complaint to the appropriate authorities;" and 7) the fact that "the client has the opportunity to speak with independent counsel before signing the contract."  Hodges, 103 So. 3d at 1077.

In Pennsylvania, the state Supreme Court has been vested with the exclusive authority to "prescribe general rules governing [the] . . . practice of law."  Article V, Section 10, Pa. Const.[10] Pursuant to this authority, the Pennsylvania Supreme Court promulgated the Rules of Professional Conduct.  The Rules state that "[a] lawyer shall not . . . make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement."  Pa. R.P.C. 1.8(h)(1).  The comment to this Rule explains that:

---

[10] Article V, Section 10 states, in pertinent part:

> (a) The Supreme Court shall exercise general supervisory and administrative authority over all the courts and justices of the peace, including authority to temporarily assign judges and justices of the peace from one court or district to another as it deems appropriate.
>
>         \*      \*      \*
>
> (c) The Supreme Court shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts, justices of the peace and all officers serving process or enforcing orders, judgments or decrees of any court or justice of the peace, including the power to provide for assignment and reassignment of classes of actions or classes of appeals among the several courts as the needs of justice shall require, and for admission to the bar and to practice law, and the administration of all courts and supervision of all officers of the judicial branch, if such rules are consistent with this Constitution and neither abridge, enlarge nor modify the substantive rights of any litigant, nor affect the right of the General Assembly to determine the jurisdiction of any court or justice of the peace, nor suspend nor alter any statute of limitation or repose. All laws shall be suspended to the extent that they are inconsistent with rules prescribed under these provisions.

> [a]greements prospectively limiting a lawyer's liability for malpractice are prohibited unless the client is independently represented in making the agreement because they are likely to undermine competent and diligent representation. Also, many clients are unable to evaluate the desirability of making such an agreement before a dispute has arisen, particularly if they are then represented by the lawyer seeking the agreement. This paragraph does not, however, prohibit a lawyer from entering into an agreement with the client to arbitrate legal malpractice claims, provided such agreements are enforceable and the client is fully informed of the scope and effect of the agreement . . . .

Pa. R.P.C. 1.8, comment 14.

The Pennsylvania Supreme Court has yet to clarify the necessary steps that an attorney must take in order to inform a client of the "scope and effect" of an arbitration agreement. Id. Due to the dearth of authority in Pennsylvania, Plaintiffs urge this Court to follow Hodges' notice requirements and invalidate the arbitration clause in the Engagement Letter because it does not fully communicate that Mr. Sanford relinquished the rights set forth in Hodges when he signed.

As noted above, the FAA does not exempt attorney-client arbitration agreements from its coverage. Attorney-client arbitration agreements are enforceable like all other arbitration agreements under the Act. However, in Pennsylvania, attorneys are under a special duty to inform their clients of the "scope and effect" of an arbitration agreement. This notice requirement would seem to mandate that certain terms be included in the attorney-client engagement agreement or in the arbitration clause itself to comply with the requisite "scope and effect" provision. While it is not the function of this Court sua sponte to create ethical rules for attorneys in Pennsylvania, it should be pointed out that in Hodges, the Louisiana Supreme Court was able to find the arbitration clause unenforceable and enact new rules requiring certain disclosures because that court has "exclusive and plenary power to define and regulate all facets

of the practice of law, including the . . . conduct of lawyers . . . and the client-attorney

relationship." Hodges, 103 So. 3d at 1073.

As discussed above, the Supreme Court of Pennsylvania is the only court with the power

to "prescribe general rules governing [the] . . . practice of law" in Pennsylvania.  Article V,

Section 10, Pa. Const.[11]  See Com. v. Stern, 549 Pa. 505, 701 A.2d 568 (1997) (Pennsylvania

legislature violated separation of powers when it enacted a statute criminalizing certain attorney

conduct after the Pennsylvania Supreme Court dealt with such conduct in their rules of

professional conduct.).  The Supreme Court of Pennsylvania is the appropriate court to clarify

the steps that an attorney must take to notify a client of the "scope and effect" of an arbitration

clause.  Pa. R.P.C. 1.8, comment 14.  Whether the Supreme Court wishes to adopt the seven

notice requirements set forth in the Hodges decision is that court's prerogative.

---

[11] Although Defendant is a New York law firm, neither party argues that the enforceability of the
arbitration clause should be examined under New York law.  New York courts also have not
thoroughly addressed "the issue of disclosure in regard to arbitration agreements."  Thies v.
Bryan Cave LLP, 831 N.Y.S. 2d 350 (Sup. Ct. 2006) aff'd, 826 N.Y.S. 2d 54 (2006).
However, New York's First Appellate Department has held that arbitration clauses embedded
within engagement letters are enforceable if they "clearly advis[ed] [the clients] that the
contract contained a binding arbitration provision, [and] set forth in detail the procedures for
dispute resolution. . . . and the commercially sophisticated plaintiffs were informed of the
ramifications of the arbitration provision and invited to contact [the law firm] with any
concerns."  Thies v. Bryan Cave LLP, 826 N.Y.S. 2d 54, 54 (N.Y. App. Div. 2006).

It is unclear whether the disclosures made by the law firm in Thies are viewed by the First
Department as sufficient or necessary disclosures.  Regardless, the Bracewell & Guiliani
arbitration clause signed by Mr. Sanford would comply with the First Department's test.  The
Engagement Letter clearly noted that it contained a binding arbitration provision.  It also set
forth that the arbitration would be governed by the International Institute for Conflict
Prevention and Resolution's Rules for Non-Administered Arbitration.  These rules were
attached to the Engagement Letter.  Further, Mr. Sanford was informed of the ramifications of
the arbitration provision including that the award was binding and could not be rejected by
commencing an action in a court of law; that the outcome would be confidential; that there
was no right to trial by jury; and that he had the right to reach out to independent counsel or
Halpern with questions.

However, it should be noted that the arbitration clause in the Bracewell & Guiliani fee letter did contain some language meant to put Mr. Sanford on notice of its scope and effect. It advised Mr. Sanford that he was waiving his right to a jury trial and would be bound by the confidential arbitration award. The Engagement Letter encouraged him to seek outside counsel or call attorney Halpern with questions. Additionally, the clause was not buried inside a lengthy engagement letter. The Letter was only four pages long. The arbitration clause was a four paragraph section labeled: "<u>Agreement Concerning Arbitration</u>." The terms were clear and easy to understand, covering "any controversy, dispute or claim . . . arising out of or relating to the engagement described in th[e] Engagement Letter or any future engagement of B&G."[12]  (Doc. No. 1-1 at 34.); <u>see</u> <u>also</u> n. 11, <u>supra</u>. Moreover, the Letter did not prospectively limit Bracewell & Guilliani's liability to the client for malpractice. Although the provisions satisfy this Court that Mr. Sanford received sufficient notice, whether these or different notice provisions are required in the future to be part of an engagement letter with an arbitration clause should be addressed by the Supreme Court of Pennsylvania.

### d.  The Arbitration Agreement is Enforceable Against Craig Sanford

Given the above analysis and weighing the three factors a court must consider when examining the elements of procedural unconscionability, the arbitration clause in the fee agreement here is not procedurally unconscionable. While the fee agreement boarders on being a standardized one with take-it-or-leave-it language, as noted above, the degree of economic compulsion motivating Mr. Sanford to sign the Engagement Letter does not favor him. Moreover, since under the FAA arbitration provisions are favored, enforceable, and allowed to

---

[12]  In <u>Bezio</u>, the arbitration clause upheld in the attorney fee agreement contained the following language: "any other dispute that arises out of or relates to this agreement or the services provided by the law firm shall also, at the election of either party, be subject to binding arbitration."  737 F.3d at 821.

be part of an attorney engagement agreement, the presence of these provisions does not support the notion that a law firm is in a more favorable bargaining position than the client. Furthermore, the present requirements of the Pennsylvania Rules of Professional Responsibility on arbitration agreements were followed.

The arbitration clause at issue here is not unconscionable.  Under the Rule 12(b)(6) motion to dismiss standard, the Complaint and supporting documents that may be considered establish that Mr. Sanford entered into a binding arbitration agreement when he signed the Engagement Letter.  He is bound by its terms and his claims against the Firm are subject to arbitration.  Additionally, since the Complaint and documents relied upon in the Complaint show that Mr. Sanford is subject to an enforceable arbitration clause, there is no need to engage in an analysis of the limited discovery the Court permitted here only because the issues involved matters of first impression under newly established decisional law.

### B. Mary Jo Sanford is Entitled to a Jury Trial to Determine Whether She is a Client of the Firm and Whether She is Required to Arbitrate Her Claims

Under the FAA, arbitration is required if the "making of the agreement for arbitration . . . is not in issue."  9 U.S.C. §4.  However, "[i]f the making of the arbitration agreement . . . [is] in issue, the court shall proceed summarily to the trial thereof."[13]  Id.

As applied to Mary Jo Sanford, Defendant's argument concerning the "making of the agreement for arbitration" is two-fold.  Id.  First, the Firm contends that Mrs. Sanford was never a client of the Firm.  She never signed the Engagement Letter and even if she had, the Letter's

---

[13]  The "FAA creates a presumption of arbitrability." Dasher v. RBC Bank, No. 13-10257, 2014 WL 504704 at *2 (11th Cir. Feb. 10, 2014).  However, "the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made."  Id. at *3.  (quoting Applied Energetics, Inc. v. NewOak Capital Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011) (internal quotations omitted)).  Here, there is a dispute between the parties as to whether Mary Jo Sanford agreed to arbitrate her claims.  As such, this Court has not applied a presumption of arbitrability to Mary Jo Sanford's claims.

terms only name Mr. Sanford as the client.  Because she was never a client, the Firm argues that she lacks standing to pursue her claims of professional negligence and breach of contract. Although Defendant has not so moved, its position is that Mrs. Sanford should be dismissed from the case.[14]

In the alternative, Defendant argues that if Mrs. Sanford is considered a client, she is bound by the arbitration clause.  They argue that because the Complaint states that Plaintiffs became clients of the firm "by way of" the Engagement Letter, Mrs. Sanford is bound by the letter's terms and is estopped from denying the enforceability of the arbitration agreement.[15] (Doc. No. 1-1 at ¶25.)

Mrs. Sanford argues that she was a client of the Firm because an implied attorney-client relationship was formed when she handed Stockwell the check from the joint account with her husband to cover the cost of the retainer and he accepted, saying that the Firm would "take the case."  (Doc. No. 24 at 94:8.)  She also argues that the Firm never gave her any information about an arbitration clause, and that she never received or signed the Engagement Letter and cannot be bound by its terms.

For the following reasons, Mrs. Sanford's status as a client and her acceptance of the arbitration agreement are in issue and a jury trial on her claims is warranted.

---

[14] At the hearing on November 6, 2013, Defendant argued: "[T]he proper outcome would be either to dismiss her now or to refer her to arbitration so that the arbitrator can dismiss her." (Doc. No. 36 at 21: 20-23.)

[15] Under the theory of estoppel, non-signatories to an arbitration clause are bound by the clause if "the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement."  E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 199 (3d Cir. 2001).

### 1.  Applicable Standard of Review

As explained above, the standard of review a court must apply in examining whether both parties consent to be bound by an arbitration clause depends on the Complaint and its supporting documents.  If these documents:

> are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on the question. After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard. In the event that summary judgment is not warranted because the party opposing arbitration can demonstrate, by means of citations to the record, that there is a genuine dispute as to the enforceability of the arbitration clause, the court may then proceed summarily to a trial regarding the making of the arbitration agreement or the failure, neglect, or refusal to perform the same, as Section 4 of the FAA envisions.[16]

Guidotti, 716 F.3d at 776.

Here, the face of the Complaint and the pertinent documents contain some conflicting language about the status of Mrs. Sanford as a client of the Firm.  While it is clear that Plaintiff Craig Sanford intended to be bound by the Engagement Letter and the arbitration clause, the same cannot be said categorically for Plaintiff Mary Jo Sanford.  First, the Complaint states that Stockwell "assured the Sanfords that his firm would be able to assist them in getting a return of their money. . . ." (Doc. No. 1-1 at ¶¶22; 24) (emphasis added).  The Complaint goes on to state that "on or about September 9, 2009, the Sanfords entered into an attorney-client relationship with Bracewell & Guiliani, LLP by way of an engagement agreement between Johnathan N. Halpern, Esquire for the Firm and Mr. Sanford."  (Id. at ¶25) (emphasis added).  The

---

[16] The Court has already afforded the parties limited discovery by allowing the testimony at the hearing held on the Motion to Compel.

Engagement Letter, however, is only signed by Mr. Sanford, and states that the Firm's representation extends only to Mr. Sanford and not his spouse.  (Id. at 32-36.)  Despite this limitation on representation, the Complaint further asserts that the Firm "agreed to represent the Sanfords in obtaining a return of their money" and that "in exchange for this representation, the Sanfords paid the firm $50,000."  (Id. at ¶¶25, 26.)

Because the Complaint and the supporting documents are unclear regarding Mrs. Sanford's status as a client, and therefore the effect of the arbitration agreement on her is unclear, the Court allowed the parties to engage in limited discovery on these matters.  See Guidotti, 716 F. 3d at 774 ("[A] Rule 12(b)(6) standard is inappropriate when . . . the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity to establish on its face that the parties agreed to arbitrate.").

Testimony was heard by the Court and supplemental briefs were submitted.  (Doc. Nos. 32, 33, 34.)  Pursuant to Guidotti, now that the parties have completed their "limited discovery," the Court must examine whether there was an arbitration agreement between Defendant and Mary Jo Sanford under a Rule 56 motion for summary judgment standard.  Guidotti, 716 F.3d at 776.  Because the Court is applying a summary judgment standard to Mrs. Sanford's claims, as opposed to the standard applied to Mr. Sanford's claims, the examination of evidence will extend beyond the Complaint and supporting documents to include the testimony and additional filings, all viewed in the light most favorable to Mrs. Sanford.

### 2.   Issues of Fact Exist as to Whether Mary Jo Sanford is a Client of the Firm and Whether She is Required to Arbitrate Her Claims

Under the summary judgment standard, Defendant must show "that there is no genuine dispute" as to the arbitrability of Mrs. Sanford's claims.  Fed. R. Civ. P. 56(a).  Because the

arbitration clause in this case binds only the client and the law firm,[17] in order to determine whether Mary Jo Sanford is bound by the clause, it is first necessary to determine whether she was a client of the firm.  Usually, the attorney-client relationship is consummated through a signed engagement letter.  Here, Mrs. Sanford did not sign such a letter.  According to her testimony, she was unaware of the existence of the Engagement Letter signed by her husband.  Thus, Bracewell & Guiliani made no express contract with Mrs. Sanford.

However, under Pennsylvania law, the attorney-client relationship may be formed either by express contract or by implication.  See Atkinson v. Haug, 424 Pa. Super. 406, 412 (1993).  An implied attorney-client relationship is established when: "1) the purported client sought advice or assistance from the attorney; 2) the advice sought was within the attorney's professional competence; 3) the attorney expressly or impliedly agreed to render such assistance; and 4) it is reasonable for the putative client to believe the attorney was representing him."  Atkinson, 424 Pa. Super. Ct. at 412 (citing Sheinkopf v. Stone, 927 F.2d 1259 (1st Cir.1991)).

Mrs. Sanford's testimony at the hearing held on July 10, 2013 raises genuine issues of material fact as to whether she had an implied contract to be a client of the firm.[18]  Her testimony, in pertinent part, is as follows:

---

[17]  See "Agreement Concerning Arbitration" in Engagement Letter (Doc. No. 1-1) ("Client and B&G agree that any controversy, dispute or claim . . . arising out of or relating to the engagement described in this Engagement Letter . . . shall be resolved by arbitration. . . .").

[18]  Under a summary judgment standard, a court must determine whether the movant has shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur, 601 F.3d at 216 (internal quotation marks omitted)).  In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Favata, 511 F. App'x at 158 (quoting

Q:    Did anyone from Bracewell & Giuliani ever tell you that
      you were the firm's client?

A:    No.

Q:    Did anyone at Bracewell & Guiliani ever send you, as
      opposed to your husband, an engagement letter?

A:    No, I don't believe so.

_____

Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ., 587 F.3d 176, 181 (3d
Cir. 2009) (quotation omitted)).

Stockwell testified that the Firm was only representing Mr. Sanford:

> Q: Was it your understanding that Bracewell & Guiliani was
>    representing both Mr. and Mrs. Sanford?
> A: No.
> Q: That would suggest that it was your understanding that they
>    were only representing Mr. Sanford.
> A: That is correct.
> Q: You never understood that they were representing Mrs.
>    Sanford?
> A:  No.  I never had any substantive conversations with Mrs.
>    Sanford about the details of the case.

(Doc. No. 30 at 24:25-25:10.)  Halpern testified that he only intended to create an attorney-
client relationship with Mr. Sanford:

> Q: Was it your intention in writing this [engagement] letter to
>    create an attorney-client relationship with Mr. Sanford or with
>    Mr. and Mrs. Sanford?
> A: Mr. Sanford only.
>                          *       *       *
> Q: Have you ever spoken to or seen, before today, Mrs. Sanford.
> A: I haven't seen and I don't recall having spoken to Mrs.
>    Sanford. . . .

(Doc. No. 24 at 51:2-5;11-14.)

Since Mrs. Sanford has the burden of establishing a genuine issue of material fact as to her
status as a client of the Firm, the Court will evaluate the evidence under the requisite summary
judgment standard in the light most favorable to her as the non-moving party.

Q:    Did you ever have any conversation with anyone at Bracewell & Guiliani concerning the terms of the engagement?

A:    No.  We talked to David Stockwell, who was working at Bracewell & Guiliani at the time, but it wasn't about engagement.  It was about, you know, the background of the case and, you know, that kind of stuff, not about engagement.

Q:    So you never participated yourself in any conversations with anyone at Bracewell concerning the terms of the engagement.  Is that correct?

A:    Correct.

Q:    Now, the check that you wrote for the 50,000 dollar retainer, was that on a joint account?

A:    Yes.

Q:    So Mr. Sanford could just as easily have written that check, correct?

A:    Yes.  But can I add something to that?

Q:    Please.

A:    I mean, it wasn't a retainer, as you say.  It was to do the work, do the case.  That was my understanding and my husband's understanding of the money.

Q:    Where did you get your understanding of that?

A:    From Craig and David Stockwell.

                    *         *         *

Q:    Did [David Stockwell] say, in your presence, for 50,000 dollars we will accomplish certain tasks?

A:    He said we would take the case.  We will find your money.  We will put – I'm not sure what the right word is – start the lawsuit.  We will start the proceedings to get your money, because we all knew time was of the essence.

26

> Q:     So it is your testimony that in your presence Mr. Stockwell undertook to find the money, or the firm, to find the money–
>
> A:     Um-hum.
>
> Q:     -- to file suit to get the money?   Is there anything else –
>
> A:     Yes.
>
> Q:     -- that he undertook to do for the 50,000 dollars, in your testimony?
>
> A:     Let me think about it for a second.  That's – that's – yeah. That was the thing.  That was he would – that was our arrangement, our oral, you know, agreement, as you say.

(Doc. No. 24 at 92:22-93:24; 94:6-23.)

Viewed in the light most favorable to Mrs. Sanford, this testimony indicates that by giving Stockwell a check from the joint bank account, she sought and paid for the Firm's legal assistance to find the absconded money and to file suit on her behalf too.  Further, Stockwell and his Firm were competent in their ability to render legal advice.[19]  By taking the check and promising that his firm would get the money back, Stockwell expressly agreed to render legal assistance.  Under these circumstances, it would be reasonable for Mrs. Sanford to believe that she was being represented by counsel.

Because Mrs. Sanford has raised a genuine issue of material fact as to whether she was a client of the Firm, she is entitled to "the opportunity of proving a definite agreement to a jury." O'Neill v. ARA Servs., Inc., 457 F. Supp. 182, 185 (E.D. Pa. 1978).  In Pennsylvania, the determination of "whether the parties formed a complete contract is a question for the jury."

---

[19] Defendant argues that the advice sought was not within Stockwell's professional competence because his practice concentrates on another area of the law.  However, the second prong of the Atkinson test requires only that the advice sought be within an attorney's competence, not his expertise.  Stockwell, an experienced lawyer at a reputable law firm, was competent to give advice regarding a contract dispute.

27

Novosel v. Nationwide Ins. Co., 721 F.2d 894, 903 (3d Cir. 1983) (quoting O'Neill, 457 F. Supp. at 185.)  The "terms of a disputed oral contract is the exclusive function of the jury as a question of fact; the legal effect of the agreement is the province of the courts as a matter of law." O'Neill, 457 F. Supp. at 185-86 (citing McCormack v. Jermyn, 351 Pa. 161 (1945)).

If Mrs. Sanford is found to have been a client of the Firm under an implied contract theory, another disputed issue of fact must be resolved by the jury: whether Mrs. Sanford entered into a valid arbitration agreement with Defendant during the Firm's retention.  The record thus far indicates that the arbitration agreement was only communicated through the Engagement Letter, which she said that she never received or signed.  No evidence has been offered yet that any attorney verbally reviewed the arbitration agreement with her.  However, the Complaint states that Plaintiffs became clients of the firm "by way of" the Engagement Letter.  As a result, Defendant contends that she is bound by the arbitration clause.  Thus, whether Mrs. Sanford was a client of the Firm and bound by the arbitration clause are in dispute.  Pursuant to the FAA, "[i]f the making of the arbitration agreement . . . [is] in issue, the court shall proceed summarily to the trial thereof."  9 U.S.C. §4.

Accordingly, under the provisions of the FAA and the holding in Guidotti, a jury trial is required when the making of an arbitration clause is in issue.  Under the FAA, when the making of an arbitration agreement is in issue, "the court shall proceed . . . to . . . trial . . . ."  9 U.S.C. §4; Guidotti, 716 F.3d at 771 (quoting Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd., 636 F.2d 51, 54 (3d Cir. 1980) ("[T]he party who is contesting the making of the [arbitration] agreement has the right to have the issue presented to a jury.") (internal quotations omitted)).  Following this framework, as described above, the Guidotti Court held that when an agreement to arbitrate is in issue, and after the parties take limited discovery, the court should review a motion to

compel arbitration under a summary judgment standard.  "In the event that summary judgment is

not warranted because the party opposing arbitration can demonstrate  . . . that there is a genuine

dispute as to the enforceability of the arbitration clause, the court may then proceed summarily to

a trial regarding the making of the arbitration agreement or the failure, neglect, or refusal to

perform the same as Section 4 of the FAA envisions."  Guidotti, 716 F.3d at 776 (quoting 9

U.S.C. §4) (internal quotations omitted).

Thus, Mrs. Sanford's contractual status as a client of the Firm and whether her claims of

professional negligence and breach of contract against Defendant must be arbitrated must be

determined by a jury.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Stay Pending Arbitration (Doc. No. 3)

will be granted in part and denied in part.  Mr. Sanford's claims will be stayed pending the

outcome of arbitration.  Mrs. Sanford's claims will not be stayed.  Instead, she is entitled to have

a jury decide whether she is a client of the firm and, if so, whether she is required to arbitrate her

claims against the Firm.  An appropriate Order follows.