IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CRAIG SANFORD and
MARY JO SANFORD,

               Plaintiffs,

      v.

BRACEWELL LLP,

               Defendant.

CIVIL ACTION
NO. 13-1205

## OPINION

**Slomsky, J.**                                                   **June 28, 2017**

## I.      INTRODUCTION

This case involves allegations of legal malpractice arising from Defendant Bracewell LLP's[1] representation of Plaintiffs Craig and Mary Jo Sanford ("the Sanfords"). The parties were ordered to arbitrate this dispute. They currently disagree over whether Plaintiffs can afford the costs associated with arbitration. In this regard, this Court ordered Plaintiffs to produce financial documents demonstrating their inability to afford the arbitration costs. On repeated occasions, however, Plaintiffs have failed to fully comply with the Court's directives, and in fact have supplied documentation that suggests they can afford to pay the costs of arbitration.

Before the Court are Defendant's Motions to Dismiss Pursuant to Rule 41(b) (Doc. Nos. 47, 68) and Plaintiffs' Motion for Approval of Arbitration Order No. 1 and to Lift the Stay for Purposes Stated in the Order (Doc. No. 48).[2] For reasons that follow, the Court will withhold

---

[1] Bracewell LLP was formerly known as Bracewell & Giuliani, LLP.

[2] As the Court will explain below, Plaintiffs' Motion for Approval of Arbitration Order No. 1 and to Lift the Stay for Purposes Stated in the Order (Doc. No. 48) may be denied because Plaintiffs have failed to comply with multiple Orders of this Court requiring the Sanfords to

ruling on the Motions (Doc. Nos. 47-48, 68) and will afford Plaintiffs another opportunity to return to arbitration and pay the required fees as determined by the arbitration panel, including the initial deposit of $2,500 for Arbitrator Crane's fees. If Plaintiffs fail to pay the initial deposit of $2,500 and any other required fees by July 18, 2017, this Court should be notified by Defendant, and the Motions to Dismiss (Doc. Nos. 47, 68) will be granted and the Plaintiffs' Motion (Doc. No. 48) will be denied.

## II.    BACKGROUND

Craig and Mary Jo Sanford spent their careers building a successful medical waste disposal business. (Doc. No. 1-1 at ¶ 6.) In 2005, the Sanfords sold the business for more than $14 million. (Id. at ¶ 7.) Around two years later, the Sanfords decided to move approximately $12.5 million from the proceeds of the sale into an account with a company called SCG International, LLC ("SCG"). (Id. at ¶¶ 11, 14.) Jamie Smith, the purported Chief Executive Officer ("CEO") of SCG, originally offered to place the Sanfords' "money in an offshore interest bearing account and return it to them in [eighteen] months for a small service charge." (Id. at ¶ 12.) After relying on Smith's representations and moving the funds into an account Smith controlled, the Sanfords immediately recognized problems. (Id. at ¶¶ 14, 17.) Craig Sanford "repeatedly attempted to contact Smith by phone and email to check on [the] money and its security." (Id. at ¶ 18.) However, the Sanfords were "constantly put off and told that . . . Smith was not available, or that Smith would have to return their call at another time." (Id.) Unable to contact Smith for more than eighteen months, the Sanfords sought the assistance of an attorney.

On September 9, 2009, Craig Sanford entered into an attorney-client relationship with Jonathan N. Halpern, Esquire, of Bracewell & Giuliani LLP ("Bracewell" or "the firm") to assist

---

disclose their finances. As a result, the Court is unable to determine whether Plaintiffs can afford the cost of arbitration.

him and his wife Mary Jo in recouping their investment. (<u>Id.</u> at ¶¶ 25-26.) Upon signing the firm's representation agreement, Craig Sanford paid an initial fee of $50,000 to Bracewell in exchange for the firm's "representation to recover funds extended to SCG." (Doc. No. 1-1 at 32.) The Sanfords paid additional fees throughout Bracewell's representation. Bracewell, however, was unsuccessful in recovering their investment. (<u>Id.</u> ¶¶ 25-44.)

Plaintiffs Craig and Mary Jo Sanford initiated this action in the Court of Common Pleas of Bucks County, Pennsylvania, alleging professional negligence and breach of contract claims against Defendant Bracewell. (<u>Id.</u> ¶¶ 47-62.) Plaintiffs allege that Defendant was negligent in improperly investigating the whereabouts of the Sanfords' money, failing to locate the funds, and declining to file suit against SCG to recoup the investment, among other lapses in professional standards of legal representation. (<u>Id.</u> at ¶ 50.) Plaintiffs also allege that Defendant breached the representation agreement "by failing to exercise the requisite degree of professional skill and knowledge in its representation of Plaintiffs and by failing to provide legal services both expressly stated and as implied in the . . . agreement." (<u>Id.</u> at ¶ 59.)

On March 6, 2013, Defendant removed the action to this Court. (Doc. No. 1.) One week later, Defendant filed a Motion to Stay Pending Arbitration, which requested that the Court stay this litigation pending the outcome of arbitration proceedings as dictated by the representation agreement. (Doc. No. 3.) What followed was a protracted effort by Plaintiffs to avoid arbitration and have a jury trial.

Plaintiffs originally challenged arbitration on the grounds that the arbitration clause in the representation agreement "goes against legal ethics and public policy." (Doc. No. 7 at 9.) The parties litigated this issue for more than one year. (<u>See</u> Doc. Nos. 3, 7, 14-24, 29-36.) On March 19, 2014, this Court ordered that Craig Sanford's claims must be pursued in arbitration, but that

Mary Jo Sanford was entitled to a jury trial. (Doc. Nos. 37-38.) Defendant appealed. The United States Court of Appeals for the Third Circuit held that Mary Jo Sanford was bound by the same terms as her husband and also must adjudicate her claims through arbitration. Sanford v. Bracewell Giuliani LLP, 618 F. App'x 114, 118-19 (3d Cir. 2015).

Plaintiffs filed a demand for arbitration in the International Institute for Conflict Prevention and Resolution ("IICPR"), the arbitral forum designated in the representation agreement. (Doc. No. 48 at 3.) Under the rules of the IICPR, the parties were to select a panel of three arbitrators. (Id.) The Sanfords appointed Edward Rubenstone as its party-arbitrator, and Bracewell designated Stephen Younger. (Doc. No. 68 at 10.) Arbitrator Rubenstone and Younger chose the final arbitrator to complete the panel, the Honorable Stephen G. Crane (Ret.) from JAMS.[3] (Id.) Following the selection of the panel, a dispute arose over the cost of the arbitration proceedings.

### A. The Sanfords Challenge the Cost of the Arbitration Proceedings

On February 25, 2016, the panel held an initial telephone conference with the parties. (Doc. No. 68 at 10.) In advance of the initial conference, JAMS had requested that each party deposit $2,500 for Arbitrator Crane's fees. (Id.) Although Defendant paid its deposit, Plaintiffs did not. (Id.) During the telephone conference, counsel for Plaintiffs for the first time explained Plaintiffs' hesitancy to pay any fees associated with arbitration. Counsel balked at the arbitrator fee schedule, which noted that Arbitrator Rubenstone would receive $400 per hour, Arbitrator Younger would receive $990 per hour, and Arbitrator Crane would receive $1,100 per hour. In light of Plaintiffs' reluctance to pay the necessary costs, the panel accepted the following suggested procedure to resolve any issues associated with arbitration related expenses:

---

[3] JAMS, formerly known as Judicial Arbitration and Mediation Services, Inc., is an organization of alternative dispute resolution services, including mediation and arbitration.

> MR. BUCKLEY [counsel for Defendant]: If Mr. Haines [counsel for Plaintiffs] could respond in writing to the panel, including me, with the Sanfords' position regarding fees, either they're unwilling or unable to pay – and he should make clear which it is – then I can respond to that with a request for information in writing that we believe is necessary to evaluate our position going forward. And then the panel can decide, you know, what it is they want ordered produced.
>
> I think we can probably do all of that without another phone call.
>
> JUDGE CRANE: Excellent. Do you agree with that, Mr. Rubenstone?
>
> MR. RUBENSTONE: Sounds good to me.
>
> JUDGE CRANE: Mr. Younger?
>
> MR. YOUNGER: Same here.
>
> JUDGE CRANE: Okay. Let's proceed that way. I haven't heard any pushback from Mr. Haines on that.
>
> MR. HAINES: Yeah. Oh I have no pushback.

(Doc. No. 68-6 at 77:13-78:16.) Rather than explaining the Sanfords' position regarding arbitration fees, counsel for Plaintiffs sent an email to the panel on March 8, 2016 stating that the Sanfords did "not agree with the projected expenses and wish for me to return to Federal Court for further relief there." (Doc. No. 68-8.) In response, Defendant asked the panel to order limited discovery of the Sanfords' finances to explore their claim of inability or hesitancy to pay the arbitration fees, pursuant to the United States Supreme Court's ruling in Green Tree Financial Corp. v. Randolph, 531 U.S. 79 (2000) and the United States Court of Appeals for the Third Circuit's decision in Blair v. Scott Specialty Gases, 283 F.3d 595, 609 (3d Cir. 2002).[4] Further

---

[4] In Green Tree Financial, the Supreme Court held that an arbitration agreement, which does not mention arbitration costs, is not per se unenforceable because it fails to adequately protect a party from potentially steep arbitration expenses. 531 U.S. at 81, 91-92. Instead, the party challenging arbitration on this ground bears the burden of showing that the arbitration proceeding would be prohibitively expensive. Id. Furthermore, the United States Court of Appeals for the Third Circuit concluded in Blair that discovery on arbitration costs and the

correspondence among the parties and the panel ensued, but did not resolve the issue of apportioning arbitration expenses. On September 1, 2016, rather than apportion fees, the panel suspended arbitration by issuing an Order ("Order No. 1").[5] Order No. 1 of the arbitration panel

---

inability to pay is integral to the <u>Green Tree Financial</u> analysis of prohibitive expense allegations. <u>Blair</u>, 283 F.3d at 609.

[5] The panel suspended arbitration by issuing an Order ("Order No. 1"), which states as follows:

> The Panel Chair previously ruled that payment of the fees of the party-appointed arbitrators is to be the responsibility of the party making the appointment and the payment of the Panel Chair's fees and any related expenses is to be split equally between the parties.

> The Claimants [Sanfords], by their counsel's email dated March 8, 2016, disagreed with the projected expenses of this arbitration and asked to return to United States District Court of the Eastern District of Pennsylvania where a request to stay this arbitration had been litigated. In response to this announcement, the Respondent [Bracewell] asked this Tribunal to sign a proposed order that would direct the Claimants to produce specified financial information and to submit to depositions. Without addressing this proposed order, Claimants' counsel emailed the Panel on April 3, 2016, stating that it was not "economically feasible to continue with this arbitration based on the costs outlined in" a conference call held with the members of the Tribunal on February 25, 2016. He announced the Claimants' intention to make a motion in the District Court to remand the matter to it. On April 5, 2016, the Respondent took the position that there was no basis to remand the matter to District Court and that there was no support of the claim of economic infeasibility for the Claimants to engage in this arbitration. The Respondent renewed its request for the proposed order.

> The Tribunal held a conference call with the parties on April 13, 2016. On that call, the Respondent expressed its willingness to pay the Claimants' share of the Panel Chair's arbitration fees and expenses but only for purposes of deciding the fee payment issue. Respondent was reminded of the opportunity under Rule 17.5 to pay the full deposits on behalf of the Claimant so that the matter could be heard on the merits. The parties were given the opportunity to brief the issue further.

> Thereafter, Respondent paid the Claimant's share of the arbitration fees of the Panel Chair and related expenses for the limited purposes of having the Tribunal determine whether the costs of this arbitration are prohibitive as Claimant asserts.

explained that because the Sanfords' "economic infeasibility issues were not raised before [the District] Court," the panel declined to rule "on the financial ability to pay issues on the ground that such issues may be better heard and determined by the District Court." (Doc. No. 68-7 at 28.) The parties returned to this Court.

**B.    This Court Orders the Sanfords to Produce Evidence Regarding Their Inability to Afford the Arbitration Proceedings**

On October 19, 2016, this Court held a status conference with the parties in response to the panel's Order. (Doc. No. 46.) At the conference, the Court requested that "parties file

---

The Panel declined to sign the Respondent's proposed order, but instead set the matter down for an in-person oral argument which was held on July 19, 2016 in New York City.

At the July 19, 2016 hearing, Arbitrator Rubenstone disclosed that he had represented the Town Supervisors of Falls Township in connection with a default judgment that the Township previously obtained against the Claimants and disclosed the background facts surrounding that representation. The parties have confirmed that they have no objection to Arbitrator Rubenstone continuing to serve as an arbitrator in this matter despite this disclosure.

Accordingly, it is hereby

ORDERED that given that various arbitrability issues were previously litigated before the District Court but that the economic infeasibility issues were not raised before that Court, the tribunal declines to rule on the financial ability to pay issues on the ground that such issues may be better heard and determined by the District Court. Accordingly, the parties are granted leave to file an appropriate Motion with the District Court on the issues of the Claimants' asserted financial inability to engage in this arbitration. This Order is being entered without prejudice to any future reference back to the Tribunal by the District Court as it deems appropriate; and it is further

ORDERED that, for the reasons set forth above, this arbitration is hereby suspended; and it is further

ORDERED that counsel are directed to submit periodic status updates to the Tribunal as to the progress of the matters that are submitted to the District Court.

(Doc. No. 68-7 at 26-30.)

motions . . . on their respective positions with regard to" the panel's Order suspending arbitration for failure to apportion costs. (Doc. No. 45.)

On October 31, 2016, Defendant filed a Motion to Dismiss Pursuant to Rule 41(b). (Doc. No. 47.) Conversely, Plaintiff filed the instant Motion for Approval of Arbitration Order No. 1 and to Lift the Stay for Purposes Stated in the Order, which requested that the Court lift the stay on this litigation pending the outcome of arbitration "for the limited purpose of evaluating whether pursuing the claims in arbitration puts adjudication out of reach for the Plaintiffs because of the expense of the arbitration." (Doc. No. 48 at 1.) Each party responded in opposition to the other's outstanding Motion. (See Doc. Nos. 50-51, 53.)

On November 30, 2016, the Court held oral argument on the Motions. (See Doc. No. 56.) During the argument, the Court indicated that it would lift the stay for the purpose of allowing limited discovery into the Sanfords' ability to pay for the arbitration. The Court ordered the Sanfords to produce a broad range of documents, including:

1. "Five years' worth of financial records, to include all tax returns, personal and corporate. Certainly of the corporations identified . . . and any other corporations the Sanfords might have an interest in." (Doc. No. 58 at 57:15-19.)

2. "Any bank statements, personal and/or corporate . . . for that five-year period." (Id. at 57:21-22.)

3. "Disclosure of any real estate owned by the Sanfords, or in which they have an interest, whether it's legal or equitable." (Id. at 57:23-25.) As well as disclosure of valuations for this real estate and any encumbrances on these properties. (Id. at 63:1-20.)

4. If any money was recovered in Plaintiffs' lawsuit against Smith, and if so, how much money was recovered. (Id. at 58:1-6.)

The Court afforded the Sanfords sixty days to produce these documents. (Id. at 59:23-60:13.) Plaintiffs therefore had until the end of January 2017 to submit their financial documents. (Id.) The Court further explained that if the Sanfords were having difficulty collecting all the

documents within the sixty day period, they should turn over to Defendant whatever they had accumulated and explain that Plaintiffs are still seeking documentation.[6] The Court also noted that if there was any evidence of sandbagging or failure to produce the financial documents, the Court would "take action, and very strong action." (Id. at 34:16-17.)

### C. The Sanfords Fail to Comply with the Court's Order to Produce Financial Documentation That Would Demonstrate Their Inability to Afford the Cost of Arbitration

Despite the Court's Order, the Sanfords did not produce any documents before the deadline. On February 1, 2017, Defendant informed the Court that it had not received any financial documents from Plaintiffs. (Doc. No. 60.) A week later, counsel for Plaintiffs notified the Court that:

> Despite a clear request for five years of tax returns, financial statements, bank statements (personal and corporate), disclosure of real estate, disclosure of encumbrances on that real estate, and any valuations or appraisals in the Sanfords' possession and the recovery of items of damages from certain lawsuits, our office received the first two pages of state (Pa form 40) and federal income tax returns (form 1040) for 2014 and 2015 and one deed. Those materials are enclosed with this letter. I have asked my clients to sign an authorization to have full and complete returns released by the IRS.

---

[6] During the hearing, the Court explained:

> THE COURT: And if by then you're having problems getting the documents from the IRS or otherwise, why don't you notify the Court and we'll see where we stand, and we'll give you more time if need be.

> MR. HAINES: Yes, sir.

> THE COURT: But, you know, I think you should at the very least, whatever you can accumulate within the 60 days, by the end of the 60 days turn over to the defense, and a letter and indicated in the letter what you're still seeking, if you're still seeking documentation. And you can copy the Court on that letter.

> And if you need more time, I'll consider it. It's a lot of information, and I recognize that . . . .

(Doc. No. 58 at 60:3-15.)

(Doc. No. 61.) Although the Sanfords had produced one deed and a few pages from their 2014 and 2015 tax returns, they continued to violate the Court's Order by failing to produce the necessary financial documents to make a determination on their inability to afford arbitration expenses.

> **D.** **The Sanfords Continue to Violate the Court's Orders to Produce Financial Documentation That Would Demonstrate Their Inability to Afford the Cost of Arbitration**

On February 9, 2017, in light of the Sanfords' failure to comply with the Court's Order to produce financial documentation, Defendant renewed its request to dismiss the action. (Doc. No. 62.) In response, Plaintiffs' counsel requested "a hearing . . . so that the Sanfords may appear before the Court to explain themselves in their own words and that they can hear from the Court directly regarding the consequence of a failure of compliance" with the Court's Order. (Doc. No. 63.) The Court granted this request.

On February 21, 2017, the Court held a hearing with counsel for the parties and the Sanfords. The Court noted the Sanfords' presence at the hearing. (Doc. No. 68-8 at 3:8.) At that time, the Court explained the status of the parties' discovery on the Sanfords' inability to pay the costs of arbitration. It reiterated that the Sanfords were previously ordered to provide financial documentation, including:

1. "Five years' worth of personal and corporate tax returns, and not just the 1040 cover sheet but all the schedules." (Doc. No. 68-8 at 5:13-15.)

2. "Five years' worth of bank statements, personal and corporate." (Id. at 5:15-16.)

3. Disclosure of "their real estate holdings and any encumbrance on the real estate." (Id. at 5:17-18.)

4. If any money was recovered from the Sanfords' lawsuit against Smith, and if so, how much money was recovered. (Id. at 5:18-19.)

The Sanfords had failed to produce these documents. (<u>Id.</u> at 5:19-20.) Instead, the Sanfords had turned over one deed and a few pages from their 2014 and 2015 tax returns, which, taken together, were inadequate to make a determination on their inability to pay arbitration related expenses. The Court afforded Plaintiffs with another thirty days to produce the financial documents. (<u>See</u> Doc. No. 66.) Plaintiffs acknowledged what was required and stated that they "will comply." (Doc. No. 68-8 at 18:5:8.) Plaintiffs therefore were granted additional time to make the necessary financial disclosure, and were given until March 23, 2017 to comply with the Court's Orders. (<u>See</u> Doc. No. 65.)

Despite these instructions, Plaintiffs yet again failed to comply with the Court's Orders. Although Plaintiffs submitted selected tax returns, statements for two bank accounts, and an email listing four properties they owned, these disclosures did not create a complete picture of the Sanfords' finances or their inability to pay the costs associated with arbitration. (Doc. No. 68-9 at 2-5.)

On April 24, 2017, Defendant filed a second Motion to Dismiss Pursuant to Rule 41(b), arguing that the Sanfords failed to produce the required documents ordered by the Court. (Doc. No. 68.) Presently before the Court are Defendant's Motions to Dismiss (Doc. Nos. 47, 68) and Plaintiffs' Motion for Approval of Arbitration Order No. 1 and to Lift the Stay for Purposes Stated in the Order (Doc. No. 48). The parties have fully briefed the three Motions, which are now ripe for disposition.[7]

---

[7] In reaching a decision, the Court has considered: Plaintiffs' Complaint (<u>See</u> Doc. No. 1), Defendant's Motion to Dismiss (Doc. No. 47), Plaintiffs' Response in Opposition (Doc. No. 50), Defendant's Reply (Doc. No. 53), Plaintiffs' Motion for Approval of Arbitration Order No. 1 and to Lift the Stay for Purposes Stated in the Order (Doc. No. 48), Defendant's Response (Doc. No. 51), oral argument held on the Motions on November 21, 2016 (Doc. Nos. 56, 58), letters received from the parties (Doc. Nos. 60-63, 71), a telephone conference held on February 14, 2017 (Doc. No. 64), an additional hearing held on February 21, 2017 (Doc. Nos.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 41(b) provides that "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed. R. Civ. P. 41(b). In determining whether to dismiss a case due to a plaintiff's failure to prosecute, a court considers the six factors set forth in <u>Poulis v. State Farm Fire & Casualty Co.</u>:

> (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal . . . and (6) the meritoriousness of the claim or defense.

747 F.2d 863, 868 (3d Cir. 1984). Courts are required to consider the <u>Poulis</u> factors because "dismissal with prejudice is, undeniably, a drastic sanction." <u>In re Asbestos Products Liab. Litig. (No. VI)</u>, 718 F.3d 236, 246 (3d Cir. 2013). However, no single <u>Poulis</u> factor is dispositive, and all six factors need not be satisfied in order for a court to dismiss a complaint. <u>Briscoe v. Klaus</u>, 538 F.3d 252, 263 (3d Cir. 2008).

### IV. ANALYSIS

Defendant filed two Motions to Dismiss pursuant to Fed. R. Civ. P. 41(b), arguing that Plaintiffs repeatedly failed to comply with the Court's Orders to arbitrate and to make financial disclosures related to their inability to afford arbitration costs. (Doc. Nos. 47, 68.) Defendant argues that the "Sanfords' repeated and willful failure to comply, first, with the Court's orders to arbitrate and, later, with the Court's order to support their claimed hardship with financial disclosures justifies dismissal with prejudice under Rule 41(b)." (Doc. No. 68 at 21.)

---

65-66), Defendant's Second Motion to Dismiss (Doc. No. 68), Plaintiffs' Response in Opposition (Doc. No. 72), Defendant's Reply (Doc. No. 73), Plaintiffs' Motion for Leave to File a Supplement to the Response in Opposition (Doc. No. 74), Defendant's Response to the Motion to Supplement (Doc. No. 75), and Plaintiffs' Supplemental Response in Opposition to Defendant's Motion to Dismiss (Doc. No. 77).

As previously noted, the United States Supreme Court held in <u>Green Tree Financial Corp.</u> <u>v. Randolph</u> that an arbitration agreement, which does not mention arbitration costs, is not per se unenforceable on the theory that it fails to adequately protect a party from potentially steep arbitration expenses. 531 U.S. 81, 91-92 (2000). Instead, the party challenging arbitration on this ground bears the burden of showing that arbitration would be prohibitively expensive. <u>Id.</u> Furthermore, the United States Court of Appeals for the Third Circuit concluded in <u>Blair v. Scott</u> <u>Specialty Gases</u> that discovery on arbitration costs and the inability to pay is integral to the <u>Green Tree Financial</u> analysis of prohibitive expense allegations. <u>Blair v. Scott Specialty Gases</u>, 283 F.3d 595, 609 (3d Cir. 2002). Plaintiffs therefore had the burden of proving that the cost of arbitration was prohibitively expensive. However, Plaintiffs have repeatedly failed to meet this burden.

To date, Plaintiffs have produced the following financial documents: partial tax returns, partial statements for two bank accounts ending in -2920 and -9191, and a list of four properties they own. These documents, taken together, do not show a complete picture of the Sanfords' finances, nor do they satisfy the Court's Orders to make a complete financial disclosure.[8] The

---

[8] Defendant argues that the Plaintiffs' financial disclosures are incomplete because they have not provided the following documentation:

> 1. No Financial Statement. Although the Sanfords' put their financial circumstances at issue and bear the burden of demonstrating hardship to even begin a conversation about the cost of arbitration, the Sanfords did not produce any financial statements or other summary of current assets, liabilities, and net worth. Considering this procedural posture and the obvious complexity of the Sanfords' finances, the Sanfords' failure to produce this information—which the Court referenced several times—demonstrates their willful disregard of the Court's directive.

> 2. No Investment Account Statements. The Sanfords' tax return reflect significant interest and dividend income ($386,892 in 2015) and large investment advisory fees ($86,635 in 2015), both of which indicate that the Sanfords possess

substantial investment assets.  Yes, the Sanfords did not produce any investment account statements, nor did they provide any disclosure about the assets that are generating this income and causing them to incur these fees.  Their tax returns—which reference numerous investment accounts (such as Voya Insurance and Annuity, Charles Schwab, Energy Transfer Partners LP, Buckeye Partners LP, and Wells Fargo Brokerage Services to name a few)—demonstrate that there are relevant records that should have been produced in response to the Court's order.

3.      Incomplete Personal Bank Statements.  While the Sanfords produced selected bank statements for a William Penn Bank account ending in -2920, they did not produce the five years of records ordered by the Court and appear to not have produced statements for all of their bank accounts.

4.      Incomplete Business Bank Statements.  The Sanfords' production of bank statements for Sanford Motors is similarly deficient.  They produced statements for a William Penn Bank account ending in -9191, but once again failed to produce the five years of records ordered by the Court—ending their production in 2014.  Their assertion that, they "do not maintain balance sheets, etc. for their garage," simply does not cut it.  Sanford Motors filed taxes and therefore it must have records, which the Sanfords did not disclose.

5.      No Information on Recovery from Jamie Smith.  The Sanfords have represented they recovered some of their money from Jamie Smith and the Court ordered that they disclose the details; however, the Sanfords did not provide any information on this subject.

6.      Incomplete Disclosure of Real Estate.  On March 8, 2017, the Sanfords' attorney wrote in an e-mail that, "[t]he real estate they own and it's [sic.] estimated value is:

> Yardley, Pa. (business location and adjoining lot)
> $600,000.  There is a $400,000 bank lien (Wells Fargo) on the property
>
> 15 N. Briar Hill Road
> Lakeville, Pa.
> $250,000
>
> Morrisville Pa.
> $250,000
>
> Marcus Hook Pa.
> $50,000

partial disclosure prevents the Court from making a determination on the Sanfords' inability to afford the arbitration proceedings.

### A. The Extent of the Sanfords' Personal Responsibility for Failure to Prosecute Weighs in Favor of Dismissal

The first <u>Poulis</u> factor asks a court to analyze the extent of the party's personal responsibility in failing to prosecute his case. <u>Poulis</u>, 747 F.2d at 868. "Although no one factor is dispositive, finding the party personally responsible for the delay is an important factor in dismissing under Rule 41(b)." <u>Carter v. Ryobi Techtronics</u>, 250 F.R.D. 223, 228 (E.D. Pa. 2008).

In <u>Carter</u>, the defendant filed a motion to dismiss under Rule 41(b) due to the plaintiff's failure to prosecute. Specifically, the plaintiff failed to provide "medical, income, and workers compensation evidence from the last five years" during discovery. <u>Id.</u> at 226. The court, therefore, held a hearing to "personally instruct[] [the plaintiff] of his need to participate in the prosecution of [his] case and his need to comply with the [c]ourt's orders." <u>Id.</u> at 228. Because

---

While this bare bones disclosure reflects $750,000 in equity, it falls well short of the letter and spirit of the Court's order. First the Sanfords did not provide an address for three of the four properties. Second, the list does not include any reference to the 31.35 acres of land in the "Silver Spruce Estates" or to the property in Burleson, Texas, which are disclosed elsewhere. Third, the email does not jibe with the Sanfords' tax returns, which, for example (a) reflect that the encumbered commercial property in Morrisville, valued by the Sanfords at $250,000, generated more than $295,000 of income between 2008 and 2014; and (b) contain references to numerous real estate investment entities (Connor/Murphy Real Estate Inc. XII, Connor Group Real Estate VII, and Connor Real Estate Income IX to name a few) and deductions for more than $400,000 in losses associated with rental property.

(Doc. No. 68 at 18-20 (emphasis omitted).)

the plaintiff failed to comply with the court's instructions, the court found that he was personally responsible for the failure to prosecute and dismissed his case.[9] Id.

Like Carter, the Sanfords are personally responsible for failing to comply with the Court's Orders. They were present in court and heard firsthand the Court's instructions on what records must be produced. Therefore, this case does not involve a sympathetic situation where innocent clients suffered dismissal due to dilatory counsel who represented them. The record demonstrates that counsel conferred with the Sanfords about the importance of making the required financial disclosures both to the arbitration panel and to this Court. (Doc. No. 61.)

In fact, Plaintiffs' counsel requested that the Court hold a second hearing to impress upon the Sanfords that they must comply with the Court's Orders and submit the required financial documents. (See Doc. No. 63 at 2 ("I ask that the Court hold a hearing before dismissing the case on the basis of non-compliance with the Order so that the Sanfords may appear before the Court to explain themselves in their own words and so that they can hear from the Court directly regarding the consequence of a failure of compliance").) On February 21, 2017, in accordance with counsel's request, this Court held a hearing to explain to the Sanfords the importance of complying with the Court's instructions to disclose their financial status. (Doc. No. 68-8.) Otherwise, the Court had explained to the Sanfords that failure to comply may result in dismissal.[10] The Court also noted that it expected full compliance from the Sanfords, not

---

[9] The court in Carter also concluded that the plaintiff's counsel was personally responsible for the delay in litigation, due to his repeated failures to comply with the court's scheduling orders and discovery deadlines. Id.

[10] On February 21, 2017, the Court told the Sanfords on the record that they were to "make full disclosure of their financial assets . . . [i]f they're going to proceed with th[is] litigation." (Doc. No. 68-8 at 10:19-21.) Additionally, the Court stated in its March 20, 2014 Order, that Mr. Sanford had thirty (30) days to demand arbitration and warned that this action would be dismissed if he did not pursue it. (Doc. No. 38.)

substantial compliance.  (Id. at 14:2-4.)  The Sanfords, however, have repeatedly failed to comply with the Court's directives for more than six months.  Plaintiffs have failed to produce the financial information needed to make an informed decision about their inability to afford arbitration.  For these reasons, the Sanfords are personally responsible for their failure to comply with Court Orders and to prosecute their case.  This first Poulis factor weighs in favor of dismissal.

### B.    The Prejudice to Defendant Caused by Plaintiffs' Failure to Meet Scheduling Orders and Respond to Discovery Weighs in Favor of Dismissal

The second Poulis factor examines the prejudice to the adversary caused by a plaintiff's failure to meeting scheduling orders and to respond to discovery.  Poulis, 747 F.2d at 868. "Prejudice includes 'the excessive and possibly irremediable burdens or costs imposed on the opposing party.'"  Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 243 (3d Cir. 2007) (quoting Scarborough v. Eubanks, 747 F.2d 871, 876 (3d Cir. 1984)).

Here, the Sanfords' failure to comply with Court Orders has prejudiced Bracewell by imposing excessive and irremediable costs upon it.  On October 31, 2016, Defendant filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 41(b), in light of Plaintiffs' failure to disclose its finances to the arbitration panel and proceed with the scheduled arbitration.  (Doc. No. 47.)  On November 30, 2016, this Court held a hearing at which it ordered Plaintiffs to make such a disclosure.  (Doc. Nos. 56, 58.)  Plaintiffs, however, failed to comply with the Court's Order to make financial disclosures related to their inability to afford arbitration.  Because of Plaintiffs' failure to comply, Defendant has attempted on several occasions to obtain the necessary documentation from Plaintiff.  (Doc. Nos. 60, 62.)  On February 21, 2017, Defendant attended a second hearing held by this Court in order to emphasize to the Sanfords the importance of making the required financial disclosures.  (Doc. Nos. 65-66.)  Thereafter, Plaintiffs again failed

to comply with the Court's Orders. Once again, Defendant contacted Plaintiffs in an effort to retrieve this documentation. As a result, Defendant filed a second Motion to Dismiss pursuant to Fed. R. Civ. P. 41(b). (Doc. No. 68.)

Defendant has repeatedly conferred with Plaintiffs to disclose their finances, has attended multiple hearings to obtain these documents, and has filed multiple motions to dismiss this action under Rule 41(b) because of Plaintiffs' failure to turn over such documentation. Defendant has spent more than six months and has incurred significant expense in litigating this narrow issue of Plaintiffs' finances, which Plaintiff put in issue but refuses to resolve.[11] Therefore, Defendant has been prejudiced by Plaintiffs' failure to comply. This second <u>Poulis</u> factor weighs in favor of dismissal.

### C. The Sanfords' History of Dilatoriness Weighs in Favor of Dismissal

The third <u>Poulis</u> factor requires a court to consider the party's history of dilatoriness. <u>Poulis</u>, 747 F.2d at 868. "Extensive or repeated delay or delinquency constitutes a history of dilatoriness." <u>Hoffman v. Palace Entertainment</u>, 621 F. App'x 112, 115 (3d Cir. 2015) (quoting <u>Adams v. Trustees of N.J. Brewery Employees' Pension Trust Fund</u>, 29 F.3d 863, 874 (3d Cir. 1994)). Examples include "consistent non-response to interrogatories, or consistent tardiness in complying with court orders." <u>Adams</u>, 29 F.3d at 874.

The Sanfords have exhibited a history of dilatoriness. On November 30, 2016, this Court ordered the Sanfords to disclose certain financial documents so that the Court could make a determination on their inability to afford arbitration. (Doc. Nos. 56, 58.) The Court provided the Sanfords with sixty days, or until the end of January, to make this production. (Doc. No. 58 at

---

[11] From the record, it appears that Plaintiffs first raised the issue of inability to afford arbitration on March 8, 2016, while the case was before the arbitration panel. (Doc. No. 68-7 at 4.) On October 19, 2016, the parties returned to this Court and have been litigating this issue ever since. (Doc. No. 44.)

59:23-60:13.) However, Plaintiffs failed to meet this deadline. In fact, Plaintiffs did not submit any documentation within the initial sixty-day period. (Doc. No. 60 at 2.)

Thereafter, on February 21, 2017, the Court held a second hearing with the Sanfords present to impress upon them the importance of complying with the Court's Orders and supplying the financial documentation. (Doc. No. 68-8.) The Court afforded an additional thirty days for the Sanfords to produce these items. (Doc. No. 65.) Yet again, the Sanfords failed to meet the requirements of the Court's Orders. (Doc. No. 68 at 18.)

To date, the Sanfords have produced a limited number of documents that were ordered to be made available by the Court. (Id. at 18-20.) Thus far, they have not made a full disclosure of their finances. Since the Court and Defendant have been unable to make a determination on their inability to afford arbitration for more than six months, litigation has stalled. Despite being given specific instructions to submit these documents, and despite being afforded additional time to produce these materials, Plaintiffs have been unwilling to comply with the Court's Orders. In fact, the Sanfords have supplied only incomplete information about their finances, omitting current bank and investment statements, property valuations, and complete tax returns as requested by the Court. The Sanfords' continued failure to comply with the Court's Orders suggests a history of dilatoriness. Therefore, this third Poulis factor weighs in favor of dismissal.

### D. The Sanfords' Willful or Bad Faith Conduct in Failing to Comply with Discovery Weighs in Favor of Dismissal

The fourth Poulis factor asks whether the conduct of the party was willful or in bad faith. Poulis, 747 F.2d at 868. "Generally, '[w]illfulness involves intentional or self-serving behavior.'" Briscoe v. Klaus, 538 F.3d 252, 263 (3d Cir. 2008) (quoting Poulis, 747 F.2d at 868). Merely negligent or inadvertent behavior does not rise to the level of willful or bad faith conduct. See, e.g., Poulis, 747 F.2d at 868-69 (finding that the plaintiff counsel's behavior was not willful

because, although he had missed deadlines, there was no suggestion that his delays were for any reason other than his and his wife's poor health). "When the plaintiff has failed to comply with instructions of the court directing the plaintiff to take specific actions in this case, the court is compelled to conclude that the plaintiff's actions are not accidental or inadvertent but instead reflect an intentional disregard for th[e] case and the court's instructions." Metro Metals USA v. All-State Diversified Products, Inc., No. 12-1448, 2013 WL 1786593, at *2 (D.N.J. Apr. 25, 2013).

The record suggests that the Sanfords acted willfully or in bad faith when failing to comply with the Court's Orders to arbitrate and to produce financial documents.

First, from the outset of this litigation the Sanfords have challenged arbitration. Counsel for Plaintiffs specifically stated that the Sanfords were going to "challeng[e] every step of th[e] [arbitration] proceeding going forward." (Doc. No. 68-6 at 14:2-3.) Once ordered to arbitrate, the Sanfords continued to challenge arbitration, arguing for the first time that they were unable to afford the expenses associated with the proceeding. (Doc. No. 68 at 12-13.) On March 8, 2016, counsel stated that the Sanfords "do not agree with projected expenses and wish for me to return to the Federal Court for further relief there." (Doc. No. 68-7 at 4.) More than one year later, the Sanfords continue to challenge the cost of arbitration, yet refuse to submit a complete picture of their financial circumstances. This is demonstrative of the Sanfords' general unwillingness to comply with the Order to arbitrate this dispute and shows that they are not willing to follow the Court's directives on producing their financial information.

Second, the Sanfords have failed to comply with the Court's specific instructions to produce documents demonstrating their inability to afford arbitration. As previously noted, on November 30, 2016, the Sanfords were ordered to submit evidence of their finances, including

bank statements, tax returns, property owned, and recovery of the funds in the lawsuit against Smith.  (See Doc. Nos. 56, 58.)  Although the Sanfords were given until the end of January 2017 to produce these materials, they did not do so.  (Doc. No. 60.)  After failing to provide a single document before the end of January, the Sanfords supplied a few pages of their tax returns from 2014 and 2015, and one deed.  To spur compliance with the Court's instructions, the Court held a second hearing on February 21, 2017 during which it explained to the Sanfords the importance of producing these documents to determine their inability to afford arbitration.  (Doc. No. 68-8.)  However, the Sanfords yet again failed to comply with the Court's Orders.[12]  To date, the

---

[12] On May 25, 2017, Counsel for Plaintiffs filed a Motion for Leave to File a Supplement to the Response in Opposition to Defendant's Motion to Dismiss.  (Doc. No. 74.)  This Motion was not opposed by Defendant.  (Doc. No. 75.)  Therefore, the Court granted Plaintiffs' Motion for Leave to File a Supplement.  (Doc. No. 76.)  Thus, the record has been supplemented with an email dated May 25, 2017 from Mary Jo Sanford to counsel for Plaintiffs.  (Doc. No. 77.)  The email reads as follows:

> Hi Cliff,
>
> I am so sorry for not getting back to you earlier, but we are going to have to ask for an extension for a few weeks.  After a whirlwind of all types of doctors appointments, MRI's, X-rays, etc., following about 18 months of back and forth to determine the problem, Craig [Sanford] just had an emergency hip replacement this past Friday, May 19th.  Now we are busy with therapy and nurses and followup doctors appointments plus work on top of everything medical that is going on right now!
>
> We certainly did not plan this [] twice I was going to take him to the [emergency room] as the pain was so severe, so when they said they could schedule the surgery last week, we had no choice but to get him in because the pain had just been gradually getting more intense every day for the past several weeks.  Please extend apologies to opposing counsel.  I am working on getting additional doc[ument]s to you, but do need more time.  Thank you.  Mary Jo.

(Id. at 3.)  Although Plaintiffs requested "an extension for a few weeks," they have had more than six months to produce the necessary financial documents.  (Id.)  Though this email may suggest that the Sanfords did not willfully ignore the Court's Orders, the record proves the opposite.  On February 21, 2017, Plaintiffs came into Court and were explained the importance of complying with the Court's instructions.  (Doc. No. 68-8.)  Plaintiffs did not raise any

Sanfords have submitted selected tax returns, statements for two bank accounts, and an email listing four properties they owned. Taken together, this disclosure is inadequate to make a determination of their inability to afford the costs of arbitration.

Third, and most importantly, the Sanfords' limited disclosure suggests that they may have sufficient funds to afford arbitration, and are deliberately hiding this fact from the Court. For example, "the Sanfords' tax returns reflect significant interest and dividend income ($386,892 in 2015) and large investment advisory fees ($86,635 in 2015), both of which indicate that [they] possess substantial investment assets." (Doc. No. 68 at 19.) In addition, their tax returns "reference numerous investment accounts . . . such as Voya Insurance and Annuity, Charles Schwab, Energy Transfer Partners LP, Buckeye Partners LP and Wells Fargo Brokerage Services." (Id.) However, the Sanfords have failed to provide any relevant investment account statements. While the Court does not have a full picture of the Sanfords' financial circumstances, it does have information which suggests, contrary to Plaintiffs' assertion, that the Sanfords have substantial income-producing assets and investments. Given the inferences drawn from their limited disclosure, it appears that the Sanfords are refusing to disclose their full financial situation just to avoid arbitration.

For these reasons, the Court concludes that the fourth <u>Poulis</u> factor assessing Plaintiffs' willful or bad faith conduct weighs in favor of dismissal.

### E. The Ineffectiveness of Alternative Sanctions Weighs in Favor of Dismissal

The fifth <u>Poulis</u> factor concerns the effectiveness of sanctions other than dismissal. <u>Poulis</u>, 747 F.2d at 868. One alternative is imposing monetary sanctions on an attorney for

---

medical issues during that hearing or at any time before. (<u>Id.</u>) In fact, this is the first indication of medical issue which would delay the discovery deadlines Plaintiffs were repeatedly given but ignored. Therefore, this email does not change the Court's conclusion that the Sanfords have willfully violated the Court's Orders.

failing to prosecute a case. See Briscoe v. Klaus, 588 F.3d 252, 262 (3d Cir. 2008) (noting that the district court concluded that "monetary sanctions, including fines, costs, or payment of attorneys' fees were unavailable."). Under the Federal Rules of Civil Procedure, a court is authorized to impose on an attorney "those expenses, including attorneys' fees, caused by unjustified failure to comply with discovery orders or pretrial orders." Poulis, 747 F.2d at 869 (citing Fed. R. Civ. P. 16(f), 37(a)(4), 37(b), 37(d), and 37(g)). Such a sanction is justified where the attorney has caused "the delay and noncompliance in the proceedings." Id.

Conversely, when the delay and noncompliance is caused by the litigant, and not his attorney, monetary sanctions may not be effective. See Seeley ex rel. Shepard v. Derr, No. 12-917, 2014 WL 1024861, at *4 (M.D. Pa. Mar. 14, 2014) (citations omitted) (dismissing the action and stating that "cases construing *Poulis* agree that in a situation such as this case, where we are confronted by a litigant who will not comply with court orders, lesser sanctions may not be effective.").

Here, the Court has afforded the Sanfords multiple opportunities to comply with its Orders; however, for months, they have not done so. This delay does not appear to be caused by Plaintiffs' counsel, but by the Sanfords themselves.[13] Counsel conferred with the Sanfords on

---

[13] For example, counsel for Plaintiffs explain in the Motion for Leave to File a Supplement to the Response in Opposition to the Motion to Dismiss (Doc. No. 74) that he had been unable to reach the Sanfords in attempts to confer about filing responsive papers. The Motion states:

> On May 25, 2017, the date of this motion, counsel for plaintiffs received an email from Mrs. Sanford. This email is the first response counsel received from either Mr. or Mrs. Sanford since attempting to reach them to discuss the issues raised in the Defendant's most recently filed motion to dismiss, which remains pending.

(Doc. No. 74 at 5.) In addition, the Motion also notes:

> Counsel had been unable to reach the Plaintiffs before filing the responsive papers and did not seek an additional extension of time because the Court has been

the importance of supplying the relevant financial documents, and requested that the Court hold a second hearing at which it could impress upon the Sanfords personally the importance of compliance with the Court's discovery directives.  Because the delay and noncompliance appears to be caused by the Sanfords, and not their counsel, monetary sanctions on their attorney would be inappropriate.[14]

The Court is mindful that dismissal here is an extreme sanction.  Ware v. Rodale Press, Inc., 322 F.3d 218, 222 (3d Cir. 2003).  However, it may "employ the most severe in the spectrum of sanctions provided . . . to ensure compliance with its discovery orders and to deter all parties . . . from engaging in discovery misconduct."  Id.  For these reasons, this fifth Poulis factor weighs in favor of dismissal.

### F.     The Meritoriousness of Plaintiffs' Claims Does Not Weigh in Favor of Dismissal

Finally, the sixth Poulis factor considers the merits of a party's claims or defenses using the standard for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Huertas v. City of Phila., No. 02-7955, 2005 WL 226149, at *16 (E.D. Pa. Jan. 26, 2005), aff'd, 139 F. App'x 444 (3d Cir. 2005).  The Federal Rule of Civil Procedure 12(b)(6) motion to dismiss standard is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009), and states that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 663; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual

---

generous in offering ten (10) days when the first request for an extension was made.  Counsel made efforts to reach Plaintiffs, which were acknowledged in Mrs. Sanford's email.

(Id. at 6.)  Such effort on counsel's part shows that any delay and noncompliance is attributed to the Sanfords.

[14] Defendant does not request attorneys' fees for Plaintiffs' delay and noncompliance.

matter, accepted as true, to state a claim to relief that is plausible on its face." Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 262 n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

The Complaint alleges breach of contract and professional negligence claims arising from Bracewell's unsuccessful legal representation of the Sanfords in their attempt to recover a $12.5 million investment with Smith and SCG. (Doc. No. 1.) In particular, the Complaint alleges that Bracewell was negligent in improperly investigating the whereabouts of the Sanfords' money, failing to locate the funds, and declining the file suit against SCG to recoup the investment, among other lapses in professional standards of legal representation. (Id. at ¶ 50.) The Complaint also alleges that Bracewell breached the representation agreement "by failing to exercise the requisite degree of professional skill and knowledge in its representation of Plaintiffs and by failing to provide legal services both expressly stated and as implied in the . . . agreement." (Id. at ¶ 59.) At this stage of the litigation, the Court cannot find that these allegations, accepted as true, do not state a claim for relief. Further, the Court cannot determine whether Plaintiffs would be unable to prove these facts at trial. As such, this sixth Poulis factor weighs against dismissal.

## V. CONCLUSION

In sum, five of the six Poulis factors weigh in favor of dismissal. However, because the Court has found that the documentation made available by the Sanfords suggest that they may be able to afford arbitration, the Court will withhold ruling on Defendant's Motions to Dismiss (Doc. Nos. 47, 68) and Plaintiffs' Motion for Approval of Arbitration Order No. 1 (Doc. No. 48), and will afford the Sanfords the opportunity to return to arbitration and pay the required fees as

determined by the arbitration panel, including the initial deposit of $2,500 for Arbitrator Crane's fees. If Plaintiffs fail to pay the initial deposit of $2,500 and any other required fees by July 18, 2017, Defendant should notify the Court and the Motions to Dismiss (Doc. Nos. 47, 68) will be granted, and Plaintiffs' Motion (Doc. No. 48) will be denied. An appropriate Order follows.[15]

---

[15] If Plaintiff pursues the arbitration as required by Court Orders, then the Motions to Dismiss (Doc. Nos. 47, 68) will be denied. The Motion for Approval of Arbitration Order No. 1 will be denied as moot.